Ana María Amaro González et als., demandantes y recurridos, v. First Federal Savings Bank, demandado y peticionario.

Número: CE-90-232          Resuelto: 30 de marzo de 1993

*Carlos G. Látimer*, abogado del peticionario; *José Orlando Grau* y *Juan Carlos Grau*, de *Grau & Grau*, abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El 26 de abril de 1990 expedimos el auto de *certiorari* radicado por el peticionario First Federal Savings Bank en revisión de la determinación del Tribunal Superior de Puerto Rico, Sala de Humacao, negándose a desestimar el pleito radicado en su contra al amparo de lo resuelto en *Hartman v. Tribunal Superior*, 98 D.P.R. 124 (1969), y de la negativa del referido foro de instancia a dictar sentencia sumaria a su favor a la luz de lo resuelto en *Chase Manhattan v. Emmanuelli Bauzá*, 111 D.P.R. 708 (1981).[1] Resolvemos.

---

[1] En el recurso de *certiorari* radicado, la parte peticionaria plantea:

"1.–Si a tenor con lo resuelto en *Hartman* v. *Tribunal*, 98 D.P.R. 124 (1969) procede revocar al Tribunal Superior al no imponer las sanciones solicitadas por negativa a descubrir en un caso donde la contumacia es infinitamente más grave que en *Hartman.*"

"2.–Si procede que se dicte una sentencia sumaria desestimando el caso cuando los hechos, incontrovertiblemente establecidos, demuestran que la única participación de la Recurrente en Ciudad Cristiana fue la de proveer financiamiento permanente, individual, (no el interino para la construcción) a cada uno de los Recurridos para la adquisición de su residencia, habiendo quedado establecidos además, incontrovertiblemente, los siguientes hechos: Que los Recurridos solicitaron dicho finan-

# I

El 30 de agosto de 1985 alrededor de doscientos (200) residentes y propietarios del proyecto urbanístico Ciudad Cristiana de Humacao (Ciudad Cristiana) radicaron acción civil ante el mencionado tribunal de instancia contra el First Federal Savings Bank (First Federal), entidad financiera que les había otorgado los préstamos hipotecarios para adquirir sus viviendas. Alegaron, en síntesis, que el First Federal *conocía o debió haber conocido* que existía en esos terrenos una contaminación que convertía en inhabitables sus residencias.([2]) Le imputaron *responsabilidad solidaria* con las personas que "promovieron, gestaron, produjeron y vendieron" las casas cuyas hipotecas fueron ejecutadas. Reclamaron daños individuales de no menos de $10,000. Como parte del descubrimiento de prueba, el 23 de diciembre de 1985, el First Federal sometió a la parte demandante un pliego de interrogatorio a ser contestado, por separado y bajo juramento, por cada uno de los demandantes.([3])

El 14 de febrero de 1986 el First Federal, mediante moción, solicitó del foro de instancia que ordenara a la parte

ciamiento a la Recurrente; que la Recurrente les concedió a cada uno de ellos dicho financiamiento; que antes de firmar las escrituras, cada uno de los Recurridos había visitado la propiedad que iba a adquirir y los terrenos donde ubicaba; que la Recurrente no operó en forma alguna o tuvo establecimiento alguno en el Parque Industrial que supuestamente contaminó los terrenos de Ciudad Cristiana; que la Recurrente no contaminó la Quebrada Frontera que, supuestamente, contaminó los terrenos de Ciudad Cristiana; y que la Recurrente no participó como constructor o empresario en el desarrollo de Ciudad Cristiana ni intervino en la promoción de las ventas, todo ello a tenor con lo resuelto en el caso de *Chase Manhattan* v. *Emmanuelli Bauzá*, 111 D.P.R. 708." Petición de *certiorari*, pág. 2.

([2]) Ello en virtud de las negociaciones realizadas con el Banco de la Vivienda, la Compañía de Desarrollo Cooperativo y los constructores, *o* de haber realizado, con un mínimo de diligencia, las inspecciones, tasaciones y estudios de título que efectuó con respecto a las residencias de dicho proyecto y por los cuales les cobró.

([3]) Cabe señalar que el abogado de los demandantes nunca objetó el interrogatorio cursado.

El azaroso cuadro suscitado a raíz del envío de dicho interrogatorio es objeto del primer señalamiento de error de la petición de *certiorari* ahora ante nos.

demandante contestar el interrogatorio. El juez accedió a lo solicitado y ordenó a la parte demandante que contestara dicho interrogatorio apercibiéndole que, de lo contrario, procedería a tomar sanciones drásticas. El abogado de los demandantes le indicó al tribunal que se proponía facilitarle al demandado una contestación modelo para cada una de las preguntas debido a la magnitud del descubrimiento de prueba en los casos relacionados con Ciudad Cristiana.(⁴) Posteriormente, en reunión llevada a cabo entre los abogados de las partes, el representante legal de los demandantes acordó notificarle al demandado " 'suficientes contestaciones representativas de los hechos en que se funda[ban] sus alegaciones para que ésta pu[diera] trabajar en su estrategia litigiosa' ". Petición de *certiorari*, pág. 4. Dicho letrado incumplió con su compromiso.

El 3 de noviembre de 1986 el First Federal solicitó del tribunal que le impusiera a la parte demandante un plazo para contestar el referido interrogatorio. El foro de instancia ordenó a la parte recurrida a que dentro de un plazo perentorio de diez (10) días contestara el aludido interrogatorio so pena de imponer las sanciones que en derecho procedieran. Mediante moción, la parte demandante excusó su incumplimiento al expresar que tenía un planteamiento sobre descubrimiento de prueba ante este Foro en el caso paralelo de *Vellón v. Squibb Mfg., Inc.*,(⁵) caso que aún no se había resuelto y que entendía gobernaba el presente trámite. No obstante ello, señaló que había enviado al demandado la contestación individual del interrogatorio correspondiente al líder de la comunidad Ciudad Cristiana, José Sepúlveda Rivas, contestación que represen-

---

(⁴) Coetáneamente con el caso de epígrafe se estaban ventilando los casos de *Vellón v. Squibb Mfg., Inc.*, 117 D.P.R. 838 (1986), y el de *Cintrón Ortiz et al v. Compañía de Desarrollo Cooperativo et al*, todos relacionados con Ciudad Cristiana de Humacao. El Lcdo. José Orlando Grau ostentaba la representación legal de los demandantes en cada uno de ellos.

(⁵) 117 D.P.R. 838 (1986), opinión de 2 de diciembre de 1986.

taba, en todo lo que tuviesen en común, lo que dirían los demás demandantes. Indicó que remitiría las contestaciones individualizadas a la mayor brevedad.

El 13 de agosto de 1987 el First Federal radicó moción de desestimación; indicó que sólo se había contestado parcialmente el interrogatorio en cuanto a uno de los demandantes y que tal contestación era inadecuada. Solicitó del tribunal que ordenara a los demandantes a contestar debidamente en el plazo de quince (15) días bajo apercibimiento de desestimar el caso en cuanto a todo aquel que no contestase. El tribunal emitió orden conforme a lo solicitado. Luego de una serie de mociones y órdenes relacionadas con las contestaciones a dicho interrogatorio, el tribunal fijó una vista para la discusión de las mismas.(6)

Un día antes de la vista señalada, el First Federal solicitó la desestimación del pleito en cuanto a aquellos demandantes que no habían contestado el interrogatorio y la imposición de sanciones con respecto al codemandante Sepúlveda Rivas en vista de la tardanza extrema en contestar y de que las contestaciones estaban incompletas. La parte demandante replicó. El tribunal a quo denegó la desestimación solicitada.

Luego de una serie de mociones,(7) y órdenes relacionadas con las contestaciones al interrogatorio, el 29 de noviembre de 1989 los abogados de las partes llegaron a un acuerdo mediante el cual la parte demandante acordó que para el 28 de enero de 1990 habría de:

---

(6) En el ínterin, el 3 de noviembre de 1987, la parte demandante solicitó al tribunal que tomara medidas especiales para fraccionar el caso y dirimir, en primera instancia, la controversia de responsabilidad y, posteriormente, el aspecto de daños. *El tribunal permaneció silente con respecto a esta solicitud.*

(7) El First Federal Savings Bank (First Federal) radicó varias solicitudes de desestimación en que alegaba que las contestaciones provistas por la parte demandante eran deficientes e incompletas. Los demandantes, por su parte, replicaron en todo momento tales solicitudes y fueron contestando y remitiendo esporádicamente documentos relacionados al interrogatorio en cuestión.

(a) Contestar *adecuadamente* las preguntas: 1, 2, 3, 4, 9(a), (b), y (c), y 11, 12, 13, 14, 17, 19 y 20.

(b) En cuanto a las preguntas No. 5(b) y 6(b) *describirá* los documentos en vez de proveerlos.

(c) En cuanto a la pregunta No. 6(a) contestará *adecuadamente* lo referente a las alegaciones 2, 7, 9, 10 y 12 de la demanda.

(d) En cuanto a la pregunta No. 18 indicará lo que declararán los testigos, en particular el *Lic. Vázquez y Angel Gregorio Gómez* o cualquier otra persona que los sustituya. (Énfasis en el original.) Petición de *certiorari*, pág. 7.

En el referido plazo, la parte demandante le remitió al First Federal las contestaciones al interrogatorio; contestaciones que, según su criterio, satisfacían lo acordado. Inconforme con las mismas, el 21 de febrero de 1990, el banco demandado solicitó la desestimación de la acción de epígrafe en vista de la alegada *negativa intencional de los demandantes* a contestar el aludido interrogatorio. El tribunal de instancia, mediante resolución de fecha 1ro de marzo de 1990, denegó la moción de desestimación del banco demandado.

Acude ante nos el First Federal. Sostiene, en primer término, que procede revocar el dictamen del tribunal de instancia y eliminar las alegaciones de la demanda y desestimar la acción de los demandantes debido a la negativa contumaz de dicha parte a descubrir. Invoca a su favor la doctrina pautada en *Hartman v. Tribunal Superior*, ante; esboza que la conducta aquí observada es más grave que la allí acaecida. Procedemos a examinar, de entrada, este primer señalamiento de error.

## II

En *Hartman v. Tribunal Superior*, supra, el demandante peticionario solicitó de este Foro que le impusiera a la parte interventora las sanciones que al amparo de la

Regla 34 de Procedimiento Civil, 32 L.P.R.A. Ap. III, procedieran, dado que ésta no había contestado cierto interrogatorio que le fuera enviado hacía casi un año y medio antes. Este Tribunal, luego de hacer una exégesis de la referida regla y de su jurisprudencia interpretativa, consideró procedente, como sanción, impedirle a la parte interventora presentar cierta prueba relacionada con la composición química de un producto, sobre la cual se había negado a descubrir prueba. Le impusimos, además, gastos y honorarios y, al remitir el caso al tribunal de instancia, fijamos un plazo improrrogable para que contestara el interrogatorio bajo apercibimiento de que su incumplimiento acarrearía la imposición de sanciones adicionales.

■ La disposición reglamentaria específicamente invocada y analizada en *Hartman v. Tribunal Superior*, supra, lo fue la Regla 34.4 de Procedimiento Civil de 1958.([8]) Esta regla, así como su casuística,([9]) permitían la drástica sanción de la desestimación del pleito ante la *negativa intencional* de una parte a descubrir. Dicha regla procesal, equivalente a la Regla 37(d) de Procedimiento Civil federal de 1943, facultaba a los tribunales, en su discreción, a desestimar una acción si la parte actora *intencionalmente*, entre otras, se negaba a contestar los interrogatorios notificados por la parte adversa. Se entendía que la actuación de una parte en no descubrir prueba era intencional cuando que-

---

([8]) Esta regla *leía* así:

"Si una parte, o un funcionario o agente administrador de una parte, dejare *intencionalmente* de comparecer ante el funcionario que ha de tomar su deposición después de haber sido debidamente notificado; o dejare de presentar y notificar contestaciones a los interrogatorios sometidos de acuerdo con la Regla 30 después de habérsele notificado debidamente los mismos; el tribunal, mediante moción y notificación, podrá eliminar total o parcialmente cualquier alegación de esa parte, o desestimar el pleito o procedimiento o alguna parte del mismo, o dictar sentencia en rebeldía contra dicha parte." (Énfasis suplido.) 32 L.P.R.A. Ap. II (ed. 1982).

([9]) *Pepín v. Ready-Mix Concrete*, 70 D.P.R. 758, 760–761 (1950); *Peña v. Sucn. Blondet*, 72 D.P.R. 9, 12 (1951); *Reyes v. Mayagüez Transport*, 86 D.P.R. 273, 277–278 (1962); *Díaz v. Marshak Auto Dist., Inc.*, 95 D.P.R. 690, 697–698 (1968).

daba demostrado que ésta había procedido en forma dilatoria o contumaz al negarse a contestar los interrogatorios o los había contestado en forma evasiva. *Hartman v. Tribunal Superior*, supra, pág. 133; *Peña v. Sucn. Blondet*, 72 D.P.R. 9, 12–13 (1951).

Con la enmienda a las Reglas de Procedimiento Civil de 1979, la citada Regla 34.4 sufrió cambios, a saber: se eliminó el requisito de la intención de su texto y se añadió la excepción sobre órdenes protectoras al eximente de la sanción. Al presente, esta regla, en su parte pertinente, lee así:

34.4 *Falta de comparecencia o de presentación de contestaciones a interrogatorios o a inspección solicitada*

Si una parte, o un funcionario o agente administrador de una parte o una persona designada para testificar a su nombre según disponen las Reglas 27.5 ó 28, dejare de ... (2) presentar contestaciones u objeciones a los interrogatorios sometidos de acuerdo con la Regla 30 después de habérsele notificado debidamente los mismos; o ... a solicitud de parte, podrá dictar, con relación al incumplimiento, aquellas órdenes que fueren justas, entre ellas podrá tomar cualquier acción de las autorizadas en los incisos (1), (2) y (3) del apartado (b) de la Regla 34.2. En lugar de cualesquiera de las anteriores órdenes o en adición a las mismas, el tribunal impondrá a la parte que incumpliere o al abogado que la aconsejó, o a ambos, el pago del importe de los gastos razonables ocasionados por la negativa, incluyendo honorarios de abogado, a menos que el tribunal determine que existía una justificación válida para el incumplimiento o, que dentro de las circunstancias, el pago de los gastos resultaría injusto.

No será excusable la falta de cumplimiento a que se refiere esta regla, por el fundamento de que lo solicitado es objetable, a menos que la parte que incumpla haya obtenido una orden pro-

tectora de acuerdo con la Regla 23.2.([10]) 32 L.P.R.A. Ap. III, R. 34.4.

No obstante el nuevo lenguaje de la vigente Regla 34.4 que elimina el requisito de intencionalidad del texto, se ha entendido que la jurisprudencia anterior sigue vigente en nuestro ordenamiento civil procesal en tanto y en cuanto éste reconoce la aplicación —en determinadas instancias— de sanciones drásticas como lo son la eliminación de las alegaciones, la desestimación de la acción y la anotación de rebeldía. A esos efectos, el profesor Cuevas Segarra señala que:

> El nuevo texto, que elimina el requisito de intencionalidad y añade la excepción de las medidas protectoras al eximente de la sanción, parece sugerir que basta con que se deje de actuar según requerido para que proceda la sanción que dispone la regla, pues ciertamente la negligencia, aunque no sea conducta intencional, es tan censurable como la contumacia. *Lo que sucede es que obviamente en un caso de omisión por negligencia el tribunal no debe recurrir al remedio drástico de la desestimación que es, después de todo, la última sanción a la que el tribunal debe recurrir en todo caso. Las sanciones económicas, aunque modestas, pueden cumplir el propósito de desalentar la negligencia y hasta el olvido.* Visto de este modo, *la citada jurisprudencia es perfectamente armonizable con la nueva regla.* (Énfasis suplido.) J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1985, Vol. II, Cap. V, pág. 175. Véanse, además: *Guías propuestas para dirigir la fase del descubrimiento de prueba en casos complejos*, Secretariado de la Conferencia Judicial, mayo de 1988,

---

([10]) La Regla 34.2(b)(1), (2) y (3), por su parte, faculta al tribunal a emitir:

(1) Una orden al efecto de que las materias comprendidas en las órdenes antes mencionadas o cualesquiera otros hechos designados por el tribunal, sean considerados como probados a los efectos del pleito, de conformidad con la reclamación de la parte que obtuvo la orden.

(2) Una orden negándose a permitir a la parte que incumpliere, sostener u oponerse a determinadas reclamaciones o defensas, o prohibiéndole la presentación de determinada materia en evidencia.

(3) Una orden eliminando alegaciones o parte de las mismas, o suspendiendo todos los procedimientos posteriores hasta que la orden sea acatada, o desestimando el pleito o procedimiento o cualquier parte de los mismos, o dictando una sentencia en rebeldía contra la parte que incumpliere. 32 L.P.R.A. Ap. III.

Anejo I, págs. 15–16; *Nuevos enfoques en la administración judicial*, Secretariado de la Conferencia Judicial, octubre de 1982, pág. 131 y ss.

■ Cónsono con lo expresado y en el contexto más amplio de la imposición de sanciones drásticas, este Tribunal, preocupado por que una parte fuera penalizada por las actuaciones displicentes de su representación legal sin que ésta tuviera conocimiento de las mismas, en *Maldonado v. Srio. de Rec. Naturales*, 113 D.P.R. 494, 498 (1982), pautó como norma a regir lo siguiente:

> *Planteada ante un tribunal una situación que, de acuerdo con la ley y la jurisprudencia aplicables, amerita la imposición de sanciones, éste debe, en primer término, imponer las mismas al abogado de la parte. Si dicha acción disciplinaria no produce frutos positivos, procederá la imposición de la severa sanción de la desestimación de la demanda o la eliminación de las alegaciones, tan solo después que la parte haya sido debidamente informada y/o apercibida de la situación y de las consecuencias que puede tener el que la misma no sea corregida.* La experiencia señala que en la gran mayoría de los casos que presentan esta clase de dificultades —el presente caso es un ejemplo de ello— las partes no están enteradas de la actuación negligente de sus abogados y, al advenir en conocimiento de ello, la situación es corregida de inmediato. Una parte que haya sido informada y apercibida de esta clase de situación y no tome acción correctiva, nunca se podrá querellar, ante ningún foro, de que se le despojó injustificadamente de su causa de acción y/o defensas. (Énfasis suplido y escolio omitido.)[11]

■ Subsiste, pues, en nuestro ordenamiento procesal civil la imposición de sanciones severas para aquellos *casos extremos* en que no exista duda alguna de la "irresponsabilidad o contumacia *de la parte* contra quien se toman las

---

[11] Véase, en adición, *Ramírez de Arellano v. Srio. de Hacienda*, 85 D.P.R. 823 (1962). En dicho caso ya este Foro había expresado su preocupación al respecto al indicar que "[l]a desestimación de un pleito sin ir a sus méritos como un medio de sanción, debe ser de los últimos recursos a utilizarse después que otras sanciones hayan probado ser ineficaces en el orden de administrar justicia *y, en todo caso, no debería procederse a ella sin un previo apercibimiento*". (Énfasis suplido.) Íd., págs. 829–830.

medidas drásticas" (énfasis suplido), *Acevedo v. Companía Telefónica de P.R.*, 102 D.P.R. 787, 791 (1974), y donde ha quedado al descubierto "el desinterés y abandono *de la parte* de su caso" (énfasis suplido), *Arce v. Club Gallístico de San Juan*, 105 D.P.R. 305, 307 (1976). Véanse, además: *Lluch v. España Service Sta.*, 117 D.P.R. 729 (1986); *Dávila v. Hosp. San Miguel, Inc.*, 117 D.P.R. 807, 814–819 (1986); *Echevarría Jiménez v. Sucn. Pérez Meri*, 123 D.P.R. 664, 673 (1989).

■ De igual manera, y en armonía con lo expresado, la tendencia jurisprudencial ha sido la de imponer sanciones económicas, en primera instancia, contra *aquella parte* que observa una conducta censurable bajo nuestro ordenamiento civil procesal. Esta "suavización" de la sanción así como el postergar la imposición de sanciones drásticas y severas como último recurso al cual se deba acudir, responde a la política judicial imperante, por un lado, de que los casos se ventilen en sus méritos y, por otro lado, de que éstos se resuelvan de forma justa, rápida y económica. Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Nuevos enfoques en la administración judicial*, supra, págs. 124–125; *Dávila v. Hosp. San Miguel, Inc.*, supra, pág. 818 y casos allí citados. En el pasado, la imposición de sanciones de índole económica contra una parte ha sido utilizada con efectividad por nuestros tribunales en el área del descubrimiento de prueba, *Ramos Carrillo v. Tribunal Superior*, 102 D.P.R. 756 (1974); *Girard Industries Corp. v. Tribunal Superior*, 103 D.P.R. 680 (1975), para motivarla a agilizar esta etapa procesal. Esta práctica, por parte de nuestros tribunales de instancia, ha ido ganando terreno en nuestro ordenamiento y constituye, al presente, un sabio método para aligerar los procesos judiciales.

### III

La solicitud del First Federal de que, en esta etapa de los procedimientos, apliquemos la *severa* sanción de la de-

sestimación en el caso de epígrafe es improcedente. La naturaleza del presente litigio, el hecho de que el abogado de los demandantes les representara al mismo tiempo en dos (2) casos germanos relacionados con Ciudad Cristiana, y dado el caso de que la parte demandante lo constituyen familias humildes, nos llevan a concluir que el descubrimiento de prueba referente al interrogatorio de marras ha estado práctica y exclusivamente en manos del representante legal de los demandantes. En vista de ello, y no obstante las innumerables solicitudes del demandado y las admoniciones del tribunal de instancia de desestimar la acción, *la realidad es que la parte demandante nunca fue apercibida de los incumplimientos de su abogado con respecto al descubrimiento de prueba en cuestión.* El tribunal nunca les alertó en ánimo de que tomaran acción correctiva a esos efectos. *Maldonado v. Srio. de Rec. Naturales,* supra. Si bien es cierto que la conducta observada es una digna de sanciones, un examen del expediente revela que el tribunal de instancia se limitó a apercibir a la parte demandante, *por conducto de su abogado,* de que su incumplimiento conllevaría la drástica sanción de la desestimación. En momento alguno impuso al abogado[12] y/o a la parte litigante sanciones de índole económica en aras de agilizar el descubrimiento de prueba. *Ramos Carrillo v. Tribunal Superior,* supra; *Girard Industries Corp. v. Tribunal Superior,* supra. Por lo que, a nuestro juicio, recurrir a la desestimación del pleito, *en primera instancia,* como castigo por la conducta procesal observada resulta improcedente *en estos momentos.*

El caso ante nuestra consideración es un ejemplo vivo de lo que *no* debe de ocurrir ante nuestros tribunales de instancia. Una vez iniciado el descubrimiento de prueba, mediante el envío del aludido interrogatorio, el caso entró en un limbo procesal del cual aún no ha salido. Las reiteradas mociones del demandado para que la parte deman-

---

[12] *Lluch v. España Service Sta.,* 117 D.P.R. 729 (1986).

dante contestara adecuadamente el interrogatorio, a lo sumo, movieron al tribunal a emitir órdenes admonitorias de actuar según lo solicitado; *órdenes que no dejaron de ser meros apercibimientos huecos.*

■ Se observa que el esquema adoptado por las Reglas de Procedimiento Civil de 1979 *dejó en manos de los abogados el trámite del descubrimiento de prueba en ánimo de promover una mayor flexibilidad y cooperación entre éstos en una etapa tan crucial del proceso judicial y con el propósito de minimizar la intervención judicial en tal etapa.*([13]) No obstante ello, en *Lluch v. España Service Sta.*, supra, págs. 743–744, *hicimos la salvedad que esto no significaba que el tribunal tuviera que quedarse cruzado de brazos en espera de que una o ambas partes acudieran ante él para entonces intervenir y encausar los trámites* Expresamente indicamos que "[e]l hecho de que las reglas le [hubiesen] impuesto a los abogados de las partes mayor responsabilidad con el uso de los mecanismos de descubrimiento de prueba *no releva*[*ba*] *al tribunal de su deber de velar por que los procedimientos garanti*[*zaren*] *la solución justa, rápida y económica de los casos*". (Énfasis suplido.) Íd., pág. 744.

Un examen del expediente del caso ante nuestra consideración nos lleva a concluir que el foro de instancia no observó las directrices que pautáramos en *Lluch v. España Service Sta.*, supra.([14]) El tribunal a quo asumió una actitud sumisa con relación al rol que debía ejercer y no tomó control del caso de epígrafe en una etapa temprana de los procedimientos. Lo acaecido cobra mayor énfasis en un

---

([13]) *Lluch v. España Service Sta.*, supra, págs. 743–744; *Aponte v. Sears Roebuck de P.R., Inc.*, 129 D.P.R. 1042 (1992).

([14]) Esto, en parte, pudo deberse a que en el decurso de cuatro años por lo menos *cinco* (5) magistrados intervinieron en el caso de epígrafe.

caso como el presente, en vista de que podemos decir que se trata de un pleito complejo.([15])

En *Vellón v. Squibb Mfg., Inc.*, supra, pág. 847, advertimos a nuestros tribunales de instancia que éstos tenían que enfrentarse a este tipo de litigio "de forma decidida e imaginativa, adaptando los mecanismos. procesales existentes y haciendo uso activo de todos los recursos que t[enían] a su disposición" y estructurando "los mecanismos procesales necesarios para adjudicar pronta y adecuadamente este nuevo tipo de controversias". Allí expresamos que el éxito del trámite fluido de un pleito de esta naturaleza dependía "en gran medida de la participación activa e imaginativa del juez, complementada por una conducta profesional y cooperadora por parte de los abogados".([16]) Íd. Desafortunadamente, las palabras expresadas en *Vellón v. Squibb Mfg., Inc.*, supra, no encontraron eco en los protagonistas del caso de epígrafe.

Un detenido examen de las contestaciones suplidas por la parte demandante en el presente caso nos llevan a concluir que éstas no han sido contestadas de forma completa y/o adecuada y de que algunas no son responsivas. Se observa que en la resolución de la cual se recurre, el tribunal, en un intento de finalizar en primer lugar el descubrimiento de prueba sobre el aspecto de responsabilidad, ordenó a la parte demandante informar la prueba que tuviere para probar su teoría del caso de modo que el

---

([15]) En *Vellón v. Squibb Mfg., Inc.*, supra, pág. 847, definimos un caso complejo como aquel que envuelve multiplicidad de partes, donde existe un monto de cuantías reclamadas, hay un extenso y complicado descubrimiento de prueba y hay controversias de hechos o de derecho complejas y técnicas. Véase *Ortiz Rivera v. E.L.A., National Ins. Co.*, 125 D.P.R. 65, 69 (1989).

([16]) No existe un formato estándar para todos los casos complejos. El descubrimiento de prueba, por ende, deberá ser delineado según las circunstancias particulares de cada caso: una ardua tarea que dependerá del esfuerzo conjunto y creativo del juez y de los abogados. El plan de descubrimiento de prueba deberá ser evaluado y revisado periódicamente según las circunstancias del caso así lo requieran. *Manual for Complex Litigation*, 2da ed., Nueva York, Clark Boardman Co., 1986, Sec. 21.41, pág. 43.

demandado pudiera "señalar luego aquellos aspectos de su gestión descubridora dirigidos a tal específico fin". Anejo de la Petición de *certiorari*, pág. 1. La parte demandante radicó moción a esos efectos. El tribunal se dio por enterado. Un examen de la referida moción nos lleva a concluir, de igual manera, que ésta es del todo general; carece de especificidad y, a nuestro juicio, no cumplió con lo solicitado.

Al remitir el presente caso al foro de instancia hacemos el *señalamiento específico* de que el magistrado deberá, *de inmediato*, concertar una o varias vistas con los abogados de las partes para auscultar —en primer lugar— cuáles de estas preguntas específicamente atañen la controversia de responsabilidad y de qué modo la parte demandante deberá contestar las mismas para que se entiendan contestadas.([17]) Una vez esclarecido esto, el tribunal dará *a la parte demandante* un plazo *improrrogable* bajo apercibimiento de las sanciones que estime pertinentes para que ésta cumpla con lo acordado. Advertimos al abogado de los demandantes que en el cumplimiento con las contestaciones al interrogatorio tenga bien presente que atrás hemos dejado "la deportiva teoría de justicia que tanto mina la fe de nuestro pueblo en el sistema judicial". *Lluch v. España Service Sta.*, supra, pág. 743 y casos allí citados. *General Electric v. Concessionaires, Inc.*, 118 D.P.R. 32, 38 (1986); *Aponte v. Sears Roebuck de P.R., Inc.*, 129 D.P.R. 1042 (1992). Invitamos a los letrados de ambas partes a que, en un gesto de cooperación, hagan un esfuerzo máximo para

---

([17]) Entendemos que alguna de esta información podría estar en manos ajenas a la parte demandante por lo que le sería imposible proveerla. Existe otra prueba que le es más accesible al demandado que a los demandantes, por lo que se auscultará la posibilidad de relevarles de proveer la misma. Existe, por otro lado, documentación consignada en el tribunal que bien podría contestar varias de las preguntas y que no le sería oneroso a los demandantes sustraerla y así proveérsela al banco demandado.

dar por finalizado el descubrimiento de prueba en el caso de epígrafe a la mayor brevedad.

Estimada la conducta procesal observada por el abogado de los demandantes, consideramos procedente imponerle a éste una sanción de $500, pagadera al Estado, apercibiéndole de que en el futuro deberá ser más diligente en el trámite procesal del caso.

## IV

Atendemos el segundo señalamiento de error. Como parte del descubrimiento de prueba, el 14 de febrero de 1986, el First Federal envió a la parte demandante un Requerimiento de Admisiones e Interrogatorio dirigido a dar por admitidos los siguientes hechos: que los demandantes visitaron la propiedad y terrenos previo a firmar la escritura de compraventa de sus viviendas; que éstos carecen de conocimiento de que el First Federal haya operado o tenga industria o establecimiento alguno en el Parque Industrial de Humacao; que no tienen conocimiento de que el First Federal haya contaminado la Quebrada Frontera de Humacao; que desconocen que el Banco demandado haya participado como constructor o empresario en el desarrollo de Ciudad Cristiana o que haya intervenido en la promoción de ventas de dicho proyecto, y que hasta donde tienen conocimiento la intervención del banco se limitó a concederle el financiamiento permanente para la compra de ciertas viviendas ubicadas en tal proyecto y a actos relacionados con la concesión de tal financiamiento. Los demandantes contestaron dicho requerimiento, aceptando el mismo.

Luego de varios incidentes procesales, el 21 de febrero de 1990 el First Federal solicitó sentencia sumaria a su favor aduciendo que, conforme a los hechos admitidos y a

la luz de la doctrina pautada en *Chase Manhattan v. Emmanuelli Bauzá,* supra, procedía relevársele de responsabilidad en el caso de epígrafe. A esos efectos indicó que sus actuaciones con respecto a los demandantes, limitadas a la concesión del financiamiento permanente y a actos relacionados con el mismo, se ciñeron a la función usual que una entidad financiera provee en este género de financiamiento y en el que ésta no recibe más lucro que el correspondiente al préstamo que se efectúa.[18]

En su réplica, la parte demandante refutó la contención del First Federal al indicar que "la controversia no versa sobre lo que se hizo bajo los términos y condiciones prevalecientes en el mercado de hipotecas sino [que se trató de una] transacción especial, en virtud de una ley tutelar dirigida a facilitar la adquisición de viviendas decentes, seguras y sanitarias". Réplica a moción de reconsideración del demandado recurrente, págs. 2–3. Expresó que en virtud de esta ley tutelar[19] el First Federal, "en concierto con una instrumentalidad corporativa delincuente del Estado Libre Asociado (la Compañía de Desarrollo Cooperativo), invirtió y prestó, sin riesgo alguno, en hipotecas garantizadas por el Banco de la Vivienda". Íd., págs. 3–4. Adujo que al acogerse a los beneficios de esta ley de seguro hipoteca-

---

[18] No empece a que el First Federal no acompañó declaración jurada o documento en apoyo de su solicitud sumaria, hay constancia en autos (a las págs. 221–223) de copia de una declaración jurada suscrita por el Primer Vice Presidente del First Federal para el periodo comprendido entre 1975–1980 en la que indica al párrafo nueve (9) lo siguiente:

"9. The association accepted the collateral for the Ciudad Cristiana permanent financing loans in good faith, relying on the representations made in the commitment applications and in the individual loan applications. First Federal acted merely as a lending institution. It did not take part in the promotion or sale of the housing units in the Ciudad Cristiana project, nor did it make any representations to buyers as to the housing units for said project. As a lending institution, it relied on the representation of the borrowers to approve the loans and the collateral therefor."

[19] Ley Núm. 87 de 25 de junio de 1965, según enmendada, 7 L.P.R.A. sec. 261 y ss.

rio, el First Federal "se unió a las agencias públicas en la implantación de la política pública del Estado Libre Asociado con las obligaciones inherentes y accesorias a dicha política pública". Íd. Esbozó que el First Federal, al acogerse a ese sistema especial, y debido a que no podía perder, no le prestó atención a las *obligaciones* que asumió al cobrarle a los demandantes por un estudio de título, *tasación e inspección de sus viviendas, estudios que, de haberse realizado con la diligencia de un buen padre de familia le hubieran percatado, entre otras, de*: la inexistencia de la cooperativa; la intervención engañosa de la Compañía de Desarrollo Cooperativo; *que la urbanización estaba en la parte baja de un parque industrial y situada próxima al Caño Frontera y que éste estaba irreversiblemente contaminado*; que se predecía que las personas que fueran a vivir a Ciudad Cristiana estarían expuestas a venenos; *que la urbanización estaba asentada sobre un pantano*; que agencias regulatorias del Estado Libre Asociado habían expresado dudas sobre la habitabilidad del lugar; que las casas, calles y aceras adolecían de deficiencias y que no se había solucionado la construcción de las facilidades comunales. Expresó que el First Federal era *responsable contractualmente debido a la falta de diligencia al efectuar el estudio de título, la tasación y la inspección que le cobró* "y que se concertaron para verificar que las viviendas cuya compra se le financiaría a los demandantes eran seguras, sanitarias y decentes, verificación que no se hizo como se comprobó por los resultados posteriores". Íd. Adujo, además, que el banco demandado era *responsable extracontractualmente* por "la conducta torticera y práctica ilícita bancaria... [ostentada] al unirse a una instrumentalidad delincuente para obtener un beneficio económico al amparo de una ley de interés social con total olvido de la seguridad, la

salud y la vida de las personas para cuya protección el legislador actuó".[20] *Íd.*

El 1ro de marzo de 1990 el tribunal de instancia emitió resolución denegatoria de la solicitud sumaria del First Federal. En lo aquí pertinente dispuso:

> No desestimaremos sumariamente la demanda en su contra, como pide, pues si se prueba que tuvo conocimiento de la alegada contaminación de los terrenos y de las deficiencias, igualmente alegadas, que harían derrotar todo el proyecto urbanístico, actuando confiada en que nunca sufriría perjuicio su crédito por la forma que negoció sus créditos, sería responsable. Todo ello supone determinaciones de hecho esenciales a la acción, lo que nos impide resolver sumariamente. Ya lo habíamos resuelto el 27 de septiembre de 1989.[21] Anejo de la Petición de *certiorari*, pág. 1.

---

[20] Acompañó dicha oposición con: (1) copia de la carta del Presidente del First Federal, el Sr. Mariano Mier, dirigida a la Senadora González de Modesti indicativa de que el 9 de mayo de 1979 el Presidente de la Compañía de Desarrollo Corporativo, Sr. Félix Aldarondo Galván, le sometió al banco el caso de Ciudad Cristiana; de que ante la crisis creada por la imposibilidad de FHA de garantizar el financiamiento permanente del proyecto, el Banco de la Vivienda intervino y lo apoyó ofreciendo un subsidio a los intereses bajo la Ley Núm. 10 de 5 de julio de 1973, según enmendada, 17 L.P.R.A. sec. 651 y ss., y un seguro hipotecario bajo la Ley Núm. 87 y que ante tal solicitud y los documentos que le acompañaran (a los cuales aludiremos más adelante) éste procedió a conceder el financiamiento permanente (Autos a las págs. 667–670); (2) copia de parte de lo que se alega es un voluminoso documento titulado "Work Plan for the Remedial Investigation/Feasibility Study of the Frontera Creek Site" de la EPA de septiembre de 1986 del cual se desprende, entre otras, una cronología de los sucesos relacionados con la contaminación del área previo a mayo de 1979 (Autos a las págs. 655–664), y (3) copia de la solicitud sumaria previamente radicada por los demandantes y denegada por el tribunal a quo (la cual mencionaremos más adelante) (Autos a las págs. 635–654). Todos estos documentos indicativos de las múltiples advertencias sobre la inhabitabilidad de Ciudad Cristiana disponibles al First Federal previo a que éste concediera el financiamiento y, consecuentemente, imputándole tal conocimiento.

[21] Esta Resolución previa respondió a una moción de sentencia sumaria del demandante (Autos a las págs. 198–215) en la que solicitó se condenara al demandado a indemnizarle por "la negligencia contractual y delictuosa" desplegada porque éste conocía o debió haber conocido (en base a las ya aludidas gestiones) los factores de inhabitabilidad que aquejaban a la urbanización. Acompañó en apoyo de su solicitud: (1) copia de una carta de la FHA de 9 de febrero de 1979 al Presidente de la Compañía de Desarrollo Cooperativo indicando que no consideraría determinados bloques de Ciudad Cristiana hasta tanto se resolviera el problema de la contamina

De este dictamen acude ante nos el demandado. Expone que procedía dictar sentencia sumaria a su favor en virtud de los hechos admitidos y de la doctrina pautada por el caso de *Chase Manhattan v. Emmanuelli Bauzá*, supra.

---

ción de la Quebrada Frontera; (2) la aludida carta del Sr. Mier a la Senadora González de Modesti; (3) dos (2) consultas ante la Junta de Planificación donde se deniega la ubicación de la urbanización; (4) copia del Prólogo del Informe de la Comisión Especial de Ciudad Cristiana y del Informe del Comité Asesor al Secretario de Salud indicando la cronología de eventos relativos a la contaminación de Ciudad Cristiana; (5) copia de un documento titulado "Indice Documentos Ciudad Cristiana Relevantes al Análisis Ambiental del Caso" del cual se desprende una entrada que señala que el 29 de noviembre de 1978 el Director Regional de la FHA le cursó una carta al Presidente de la Compañía de Desarrollo Cooperativo para que le informara cómo eliminarían el problema de los contaminantes del Caño Frontera; (6) el aludido "Work Plan ...", y (7) copia de cierto "Report on the Water Quality of Quebrada Frontera" de agosto de 1978 de la Junta de Calidad Ambiental indicando los contaminantes hallados en la quebrada y sus porcientos, entre otros, (Autos a las págs. 167–197 y 453–476), todo ello en aras de demostrar la notoriedad de la contaminación previo a la intervención del First Federal e imputarle tal conocimiento.

En su oposición, el demandado tildó de inmeritoria e improcedente la solicitud sumaria de los demandantes; expresó que no debía considerarse en esa etapa de los procedimientos y que lo que procedía era desestimar la demanda. Indicó que el conocimiento que pretendía imputársele era improbable e ilógico y que la solicitud sumaria no incluía documento o declaración jurada alguna de la cual pudiera derivarse el mismo. El First Federal acompañó copias: de las declaraciones juradas de dos (2) de sus funcionarios, de la garantía de construcción sometida por la Compañía de Desarrollo Cooperativo como dueña del proyecto y del certificado de inspección que firmaban los adquirentes (Autos a las págs. 217–223) para establecer que su intervención fue la de una mera institución financiera, de que descansó en la garantía del préstamo, en las representaciones hechas por los solicitantes de los préstamos individuales y en la evidencia que le fue ofrecida de la aprobación del proyecto por las agencias gubernamentales. (No acompañó copia de estos últimos documentos). A base de ello, invocó la doctrina de *Chase Manhattan v. Emmanuelli Bauzá*, 111 D.P.R. 708 (1981), e indicó que aunque eso, de por sí, le liberaba de responsabilidad, éste rechazaba la contención de que los referidos terrenos estuvieran contaminados. Alegó que este punto se dilucidó en la corte federal de forma adversa a los demandantes. A esos efectos, posteriormente acompañó copia de la Opinión del Primer Circuito en el caso *USI Properties Corp. v. M.D. Construction Inc. y Corporación de Desarrollo Cooperativo* (Autos a las págs. 249–269) y, además, acompañó copia de un documento titulado "Superfund Update" publicado por la EPA de febrero de 1989 en el que se concluye que no había evidencia de concentraciones de mercurio en la superficie, subsuperficie o en el agua de Ciudad Cristiana que representara una amenaza de salud a los residentes de ese proyecto. (Autos a las págs. 372–381).

En esa ocasión, el tribunal, al denegar la solicitud sumaria de los demandantes y las mociones del demandado, indicó que:

"Exist[ían] hechos fundamentales en controversia, como lo [eran] el conocimiento cierto o imputado que tuvo el demandado de la alegada contaminación de los terrenos y del desperfecto de las residencias, sobre el que basa el demandante su teoría de la responsabilidad." (Autos a la pág. 497).

En el citado caso de *Chase Manhattan v. Emmanuelli Bauzá*, diversos compradores de un proyecto urbanístico instaron querellas ante D.A.Co. contra la constructora y varios bancos que habían participado en el financiamiento del proyecto, entre ellos el Chase Manhattan Bank, por los vicios ocultos de sus viviendas. El banco peticionario intervino únicamente en el *financiamiento interino* de la obra. D.A.Co. ordenó a los querellados a reparar los vicios ocultos surgidos;[22] en revisión, el tribunal de instancia confirmó.

■ Al revocar a dicho foro, y en lo que respecta al banco peticionario, este Tribunal dispuso que la responsabilidad decenal, la cuantiminosa o la redhibitoria no se extendía a una institución financiera *que se había ceñido a su función usual y cuya única intervención había sido la de proveer el financiamiento interino de la obra sin promover o participar en la construcción o en la venta de las casas.* No obstante lo expresado, se hizo la salvedad de que: "Ello no significa[ba] que dentro de otras circunstancias no pu[diera] imponérsele a un banco o a una financiera que rebas[ara] sus funciones usuales la responsabilidad decenal, la cuantiminosa, la redhibitoria, la cuasi delictual u otras derivables de nuestro ordenamiento jurídico." *Chase Manhattan v. Emmanuelli Bauzá*, supra, pág. 713.

Mediante el requerimiento de admisiones en controversia en el caso de epígrafe el banco demandado nos lleva a concluir y dar por admitidos: (1) que éste, mediante sus actuaciones, no contaminó ni directa ni indirectamente las residencias en cuestión, y (2) que éste no responde como institución financiera en una situación como la presente en vista de que no trascendió sus funciones usuales en tal

---

[22] D.A.Co. sostenía que el Chase Manhattan Bank era un "urbanizador" bajo las disposiciones del Art. 2 de la Ley Núm. 130 de 13 de junio de 1967 (17 L.P.R.A. sec. 502).

carácter. No cuestionamos esta admisión de hechos. Sin embargo, aun cuando diéramos por aceptados los mismos, éstos no versan sobre lo alegado en la demanda. En vista de ello, entendemos que la analogía que pretende trabar el First Federal entre la doctrina que sentáramos en *Chase Manhattan v. Emmanuelli Bauzá*, supra, y el caso de epígrafe es improcedente.

Allí se le quería imputar al banco responsabilidad decenal al amparo del Art. 1483 del Código Civil[23] al tildar al Chase Manhattan Bank como "urbanizador" con la consecuencia inescapable, de que éste transcendió su función usual como institución bancaria que proveyó el financiamiento interino de la obra. En el caso ante nos *no* se le imputa al banco demandado el haber rebasado o transcendido sus funciones financieras usuales en la prestación del financiamiento, en este caso, permanente. Las alegaciones de la demanda van dirigidas a imputarle responsabilidad al First Federal *por la negligencia desplegada en el desempeño de sus funciones bancarias*, toda vez que éste tuvo conocimiento o debió haber tenido conocimiento —ya fuera de las negociaciones que llevó a cabo o de haber realizado la inspección, tasación y el estudio de título de Ciudad Cristiana con un mínimo de diligencia— de la contaminación del proyecto urbanístico y que, no obstante ello, procedió a financiar los préstamos hipotecarios de los demandantes confiado en que su inversión no correría riesgo alguno porque estaba respaldada por el seguro de garantía de hipotecas provisto por la referida Ley Núm. 87.[24]

---

[23] 31 L.P.R.A. sec. 4124.

[24] El proyecto urbanístico, además, gozaba de los beneficios de la Ley Núm. 10 de 5 de julio de 1973, según enmendada, 17 L.P.R.A. sec. 651 y ss. En virtud de esta ley, el Secretario de Vivienda creó un programa para subvencionar el costo de interés del mercado de hipotecas a las familias de ingresos moderados para ayudar a que éstas puedan adquirir o arrendar una vivienda de nueva construcción. Dicha ley dispone que cualquier entidad pública o privada podrá construir viviendas bajo los términos y las condiciones dispuestos por la misma y su reglamento. Las familias a

Conforme a lo arriba expuesto, coincidimos con la resolución emitida por el tribunal de instancia, pues, aun cuando diéramos por admitido el requerimiento de admisiones, todavía quedan sin resolver los hechos relacionados con la teoría de responsabilidad de los demandantes. Es con relación a ésta que el descubrimiento de prueba aún no ha finalizado. En vista de ello, y de la improcedencia de la solicitud sumaria del First Federal a la luz del derecho invocado, *procede dictar sentencia confirmatoria de las resoluciones emitidas por el tribunal de instancia y devolver el caso de epígrafe al referido foro para la continuación de los procedimientos compatibles con lo aquí expuesto.*

Los Jueces Asociados Señores Negrón García y Hernández Denton se inhibieron.

---

quienes les vendan tales viviendas podrán acogerse al subsidio provisto por esta ley y las viviendas que así se desarrollen podrán ser financiadas mediante cualquier método de financiamiento disponible en el mercado o podrán ser financiadas de acuerdo con el programa de viviendas a bajo costo dispuesto por la Ley Núm. 82 de 26 de junio de 1964, según enmendada, 17 L.P.R.A. sec. 86 y ss., y la Ley Núm. 18 de 7 de mayo de 1964, según enmendada, 17 L.P.R.A. sec. 45a. Véase 17 L.P.R.A. sec. 652.